## HOOSER v. THRAVES.
No. 10654.

Court of Civil Appeals of Texas. Dallas.
Feb. 1, 1930.

Rehearing Denied March 15, 1930.

Webster Atwell and Cockrell, McBride, O'Donnell & Hamilton, all of Dallas, for appellant.

Bailey, Nickels & Bailey, of Dallas, for appellee.

## LOONEY, J.

John W. Hooser, owner of interests in certain producing oil leases located in Navarro county, Tex., contracted with W. A. Thraves, with reference to same, as hereinafter stated. Their original contract was entered into at Corsicana, Tex., January 6, 1925, was amended in Dallas January 7, 1925, and was again amended and supplemented in New York City on January 26, 1925. The pertinent provisions of these writings are to this effect: Thraves agreed to procure a charter from the state of Delaware, incorporating the Hooser Oil Company, with an authorized capital of $3,000,000, divided into 600,000 shares, of the par value of $5 each. John W. Hooser, W. T. Thraves, Robert Thraves, A. L. Beason, and A. L. Slaughter were to constitute the first board of directors; John W. Hooser was to be president and treasurer, W. V. Thraves first vice president, A. L. Slaughter second vice president, A. L. Beason secretary and general counsellor, and Robert Thraves New York counsellor, with offices at Wilmington, Del., Dallas, Tex., and New York City. Hooser agreed to convey to this corporation, when organized, the interest he owned in the oil leases before mentioned, and accept, as full consideration for the conveyance, all the capital stock of the corporation, less ten shares, reserved as qualifying shares for the other four directors. Hooser further obligated himself in the following language: "And I further agree that after said corporation is chartered and said properties assigned to it, as aforesaid, you (meaning W. V. Thraves) may proceed to sell a sufficient amount of the common stock of said corporation at not less than 65 per cent of the par value thereof net to me, to pay to me the sum of $1,000,000.00 * * * and I further

agree that when I shall be fully paid from the sale of stock, as aforesaid, I will transfer and deliver to you one-half of all the stock of said corporation remaining unsold." Thraves arranged with J. K. Sague, of New York City, to market 100,000 shares of this stock. Sague's written proposal to Thraves required the adoption of certain amendments to the charter of Hooser Oil Company as a condition precedent to his undertaking the task of selling stock, and in addition made the following stipulations: "The Hooser Oil Company to place in escrow in a trust company of their selection 100,000 shares of stock to be marketed by said Sague and his associates at a minimum price of $3.25 per share * * * Hooser Oil Company is to receive 65 per cent and the balance of 35 per cent is to go to the marketing syndicate. * * * The marketing syndicate undertakes and stipulates that they shall have 30 days in which to prepare their campaign for marketing the stock, and at the conclusion of 60 days from the date (January 26, 1925) of signing this contract they agree to turn in $100,-000.00 (One Hundred Thousand Dollars) to the company's treasury for stock sold, and thereafter a minimum amount of $50,000.00 (Fifty Thousand Dollars) per month until the 100,000 shares is (are) disposed of. In the event of their failure to live up to this (these) provisions, the agreement shall be immediately cancelled at your (Thraves') option."

Hooser's assent to Sague's proposal to Thraves necessitated the supplemental contract, which was executed in New York City January 26, 1925, from which we quote: "Now therefore it is agreed by both parties (Thraves and Hooser) that the charter of the Hooser Oil Company as amended, the officers, by-laws and minutes of said company, as now elected, constituted and adopted, are in full compliance with said contract, and the amendments thereto agreed upon by the parties thereto, and it is further agreed that the contract entered into this day (January 26, 1925) by second party (Thraves) with J. K. Sague and associates, for the sale of stock of the aforesaid company is in compliance with the terms and provisions of said contract and amendments thereto. It is further agreed by second party (Thraves) that for and in consideration of first party (Hooser) having given his consent to the changes in the charter, etc., of said company, as set out in the aforesaid amendment of the charter of said company, said (second) party agrees that at any time first party desires to withdraw any or all of the stock of said company, which second party is empowered under said original contract and amendments to sell for the purpose of paying first party the amount set out in said original contract, he may do so, and he may credit said stock on said amount at

65 per cent of its par value until said consideration named in said original contract be fully paid. This agreement is necessary for a proper interpretation of second party's contract with said Sague and associates. * * * It is agreed by the parties hereto that said Hooser shall have all rights and privileges of naming price at which stock shall be sold, withdrawing stock from the market, etc., set out in said contract of second party with said Sague and associates, and the provisions of said contract with said Sague shall apply to second party and all his agents, brokers and salesmen as fully as if written herein, and a copy of said contract with said Sague is hereto attached and marked Exhibit 'A' (the written proposal of Sague to Thraves). It is further agreed by the parties hereto and made a part hereof, that in the event second party has not completed the sale of stock by January 1, 1926, said original contract between the parties hereto, together with all amendments thereto, shall terminate at the option of said Hooser."

Thraves procured the charter for Hooser Oil Company, also the amendments suggested in the written proposal of Sague, and in these respects fully complied with the written contract. After the supplemental or amendatory contract of January 26, 1925, was executed, Hooser returned to Dallas, Tex., and in compliance with his obligation conveyed to Hooser Oil Company the oil leases heretofore mentioned. Within a short time thereafter the occurrences that culminated in this lawsuit took place.

Thraves sued Hooser for damages, and alleged after the predicate facts in substance that, prior to January 1, 1926 (the time limit of the contract), he could have found parties ready, able, and willing to purchase 307,692 shares of the stock of Hooser Oil Company at $5 per share (the amount necessary to raise the cash payment to Hooser of $1,000,-000), but that defendant willfully and deliberately repudiated the contract and refused to deliver stock for sale, to plaintiff's damage in the sum of $538,460; that defendant attempted to dispose of and did in fact transfer out of Hooser Oil Company all the valuable producing oil leases (conveyed to it by Hooser), thus rendering it impossible for plaintiff to dispose of the stock at any price; that, but for the breach of the contract by defendant, he (plaintiff) could and would have earned and would have been entitled to receive one-half the stock of Hooser Oil Company remaining, after the sale of 307,692 shares (less 50,000 shares to be left unsold for the benefit of the company), alleged to be 71,154 shares, of the par and reasonable market value of $5 per share; that defendant refused to deliver said stock to plaintiff for sale, but converted same to his own use and benefit, to plaintiff's damage in the sum of $355,770.

In describing his cause of action, plaintiff set up the supplemental contract of January 26, 1925 (to which the Sague proposal was attached), and referred to same in the following language, viz.: "Thereafter this plaintiff proceeded to prepare for the sale of the shares of stock belonging to the defendant Hooser in the Hooser Oil Company, and in order to facilitate the said work and by mutual consent, and for a valuable consideration, plaintiff and defendant entered into a further supplemental agreement on the 26th day of January, 1925, in the City of New York, a true copy of which is attached hereto and marked Exhibit 'C,' and prayed to be read as a part of this petition."

After a general denial, defendant Hooser urged as a special defense the following: "Further answering, defendant denies that he willfully and deliberately repudiated the contract set out in plaintiff's petition but says that he was at all times ready, able and willing to perform his part of said contract, but that said plaintiff, W. V. Thraves, as shown by Exhibit C, and Exhibit A to Exhibit C, attached to plaintiff's first amended original petition, did transfer and assign to one J. K. Sague and associates, the right to market the shares of stock of the Hooser Oil Company and did appoint the said J. K. Sague and associates his agent for the purpose of carrying out his said contract with said defendant. That the plaintiff in the name of J. K. Sague, or said J. K. Sague as agent of the plaintiff, and acting in his behalf, did demand of defendant that false and fraudulent issues of stock be made to various persons, said persons to endorse said certificate of stock and deposit same in a New York Trust Company, and that 5,000 of said shares of stock be issued immediately and delivered to the broker in order that the same might be falsely and fraudulently transferred on the stock exchange without consideration and in order that it might be made to appear to the public that said stock was active and desirable, in order to enable the said plaintiff and the said J. K. Sague to more easily sell same, and furthermore, demanded of defendant that all of said stock of said company must be deposited with the New York Trust Company, all of which demands were unwarranted by said contract by and between plaintiff and defendant. That defendant refused to issue said bogus stock and did so notify the said plaintiff and J. K. Sague, who thereupon notified this defendant that unless said conditions were complied with as above stated, no effort would be made to sell and dispose of said stock of Hooser Oil Co. and said action on the part of the said plaintiff, or J. K. Sague, made on and in behalf of plaintiff herein and as his agent,

constituted a breach and refusal to carry out the contract by and between plaintiff and defendant and was such a breach of said contract as to excuse this defendant from a performance thereof on his part."

In a supplemental petition plaintiff denied under oath that J. K. Sague or J. K. Sague and associates was or were the agent or agents of plaintiff in any sense, and especially denied the alleged agency. Replying further, plaintiff alleged that, if J. K. Sague or J. K. Sague and associates did any of the things alleged by defendant, and if such conduct constituted a breach of the contract, nevertheless defendant waived such breach, treated the contract as continuing, acted thereunder, and thereby caused plaintiff to rely upon the fact that the breach was waived, and thereby was estopped to claim or enforce the same; that the sale of said properties by the oil company and the acts of defendant in causing same rendered it impossible for either plaintiff or defendant to perform the contract, and constituted a breach by defendant.

At the conclusion of the evidence, the court directed a verdict for plaintiff against defendant for the sum of $269,229, damages in respect to the 307,691 shares of stock (the sale of which was necessary to pay defendant the sum of $1,000,000.00 cash), and the further sum of $355,770 damages in respect to the stock plaintiff would have been entitled to receive on completion of the contract, making a total of $624,999. Judgment was rendered accordingly, from which Hooser prosecutes this appeal.

Plaintiff objects to the consideration by the court of practically all assignments of error and propositions urged by defendant, on grounds of generality and multifariousness, and, further, that propositions are not germane to any assignment.

We find that a number of assignments and propositions are open to one or more of these criticisms, but we believe the assignments and propositions involved in our discussion are in substantial compliance with the rules.

The breach of the contract, insisted upon by plaintiff, was that defendant failed to escrow stock of the corporation so as to enable plaintiff to consummate sales, and further that defendant made it impossible for either party to perform the contract, in that he caused the sale by the Hooser Oil Company, of its valuable oil producing leases, thus denuding the stock of saleable value. The facts pertaining to this question are these:

On March 24, 1925, the Hooser Oil Company consummated a sale to Hughes Development Company of all its producing leases, through the procurement of Hooser, who owned all the stock of the corporation. Although Thraves was a director, he was not apprised of any purpose on the part of Hooser to cause the sale of these properties, and the first information plaintiff had of the matter was communicated in a letter and telegram dated April 3, 1925, sent him by Beason, secretary of the company, stating, in effect, that Hooser Oil Company had sold all its oil-producing properties, and cautioned Thraves to furnish this information to all prospective purchasers of stock.

■ The Hooser Oil Company was organized merely as an incident to a stock-selling enterprise, simply to enable Hooser to sell his interest in the oil leases, also to enable Thraves to reap profits for his services in selling the stock. To effectuate these purposes, Hooser conveyed the oil leases to the corporation as a basis for the issuance of the stock, to be sold by Thraves in part and owned by him in part. The continued ownership of these producing properties by the corporation was essential to the maintenance of a market value for the stock; hence their sale effectually put an end to the stock-selling enterprise.

Hooser was impliedly obligated to do nothing, during the life of the contract, calculated to deprive the stock of a market value, or to in any material sense frustrate or interfere with the successful prosecution by Thraves and his agencies of the stock selling campaign. We are of opinion, therefore, that the conduct of Hooser in superinducing the sale of these properties, unless justified (to be discussed later), constituted a breach of his contract with plaintiff.

The rule of law applicable at this point is stated in 6 R. C. L. 1020, § 380, as follows: "The act of one party in preventing the other from performing the contract is a breach thereof. The underlying principle is that he who, by mutual contract, confers on another a right or imposes a duty, impliedly agreed not to defeat that right or make impossible the performance of that duty by any affirmative acts of his own. Accordingly, from a contract which imposes on one of the parties a duty to make a payment of money to the other party within a definite time, or at least a tender thereof, there results by necessary implication the agreement on the latter's part to do no act which would render such payment or tender impossible. Therefore the latter's acts which prevent the former from tendering or paying the money constitute a breach of the contract." This doctrine is well sustained by authorities cited.

■ Was defendant justified under the circumstances in bringing about the sale of these properties by the corporation? He contends that he was so authorized under a resolution adopted by the board of directors of the company at a meeting held in New York City on January 24, 1925. This resolution, in so far as is material, reads as follows: "Be it resolved that John Hooser, President and Gen-

eral Manager of this company is hereby fully authorized, empowered and directed to take complete possession and control of all properties of whatsoever kind, belonging to said company, keep, use, manage, control and develop said properties as to him may seem best, and for that purpose he is hereby fully authorized to employ all necessary agents and employees for and on behalf of the Company as to him may seem adequate and fair and on behalf of the company to enter into all contracts for the development or sale of the properties of the Company, or for the purchase of any and all properties which in his judgment may seem necessary or expedient, and all debts so contracted for and on behalf of the Company, including the compensation of employees now or hereafter to be employed as aforesaid, shall be paid by the Company, and all other contracts made and entered into by him as aforesaid shall be the contracts of the Company, and no contract entered into by any other officer or employee of the Company shall be binding on the company until same is ratified and confirmed by said John Hooser as President and General Manager of the Company." This resolution must be interpreted, in harmony with the project then being launched of which it formed a part, and in the light of the attendant circumstances. Its adoption was just two days before the execution of the supplemental contract January 26, 1925, which was the final agreement of the parties. We think it altogether unreasonable to assume that either party at the very initial stage of the enterprise designed or intended, by the resolution in question, to provide for an early termination of the enterprise—at least not before the time (January 1, 1926) given Thraves to complete sales of sufficient stock to raise the cash consideration to be paid Hooser. The resolution, in our opinion, conferred on Hooser simply managerial power— that is, authority to control, manage, and develop the company, and to these ends he was authorized to enter into all necessary contracts, make sales, purchases, etc. Therefore we do not think Hooser can find in the resolution any justification for his conduct in causing the sale of the properties that rendered vain and futile any further efforts on the part of Thraves or his agents to market the stock of the corporation.

However, if the evidence tended to show that plaintiff breached the contract, the case should have gone to the jury, for, if he was at fault in failing (within the periods from January 26, 1925, named in the Sague proposal) to sell the amount of stock agreed to be sold, and refused to go further with the deal, as defendant contended he did, the conduct of Hooser in causing the sale of the producing properties of the corporation would be immaterial.

■ Consideration of this phase of the case necessarily involves the relation of Sague to these transactions. If he became and was Thraves' agent, statements and acts made and performed within the scope of the employment were binding upon the principal. 21 R. C. L. 844, § 25.

■ The proposal of Sague (or Sague and associates) to Thraves, for the marketing of 100,000 shares of Hooser Oil Company stock, was incorporated into and became a part of the supplementary or amendatory contract between plaintiff and defendant, executed in New York City, January 26, 1925, heretofore sufficiently described. The Sague proposal recited conditions on which he was willing to undertake the sale of the stock substantially to the effect that the charter of the Oil Company should be amended in certain respects, and that the 100,000 shares of stock to be sold by him should be escrowed with some trust company in New York City (Seaboard National Bank was selected by Hooser). His undertaking, as to price and terms, was in harmony with the Thraves-Hooser contract. He agreed to sell within 60 days from the date of said contract (January 26, 1925) $100,000 worth of said stock and turn in that amount of cash, and thereafter to sell a minimum of $50,000 per month, until the 100,000 shares were sold. He further stipulated that, in the event of his "failure to live up to this (these) provisions, the agreement shall be immediately cancelled at the option of Thraves." This arrangement was assented to by Hooser.

These writings, in our opinion, are not susceptible of any reasonable construction, other than that Sague became and was the agent of Thraves to sell 100,000 shares of the stock, and was under obligation to market the same, on the terms and within the time mentioned in said proposal. While his employment was by Thraves and the obligations of his proposal ran to Thraves, yet they were incorporated into and became a part of the supplementary contract between Thraves and Hooser. It follows, therefore, that Sague's failure to comply with the stipulations, that is, to sell stock and turn in cash in the amounts and within the periods mentioned, and his refusal to proceed further in the execution of the contract, as the evidence tended to establish, would bind Thraves just as if he had been acting in person.

■ But, if it cannot be correctly said that Sague's agency is apparent from the terms of the writings, yet the evidence was sufficient, in our opinion, to present the issue of agency as a mixed question of law and fact.

A. L. Beason, secretary of Hooser Oil Company, and Hooser's attorney, who seems to have been at his elbow throughout these transactions, testified that Thraves stated, in effect, that he had selected Sague as his

agent to take charge of stock sales in New York. We find in the testimony of Thraves such expressions as these: "I had made arrangements with Major Sague to sell 100,-000 shares * * * I had talked to Mr. Sague, one of the salesmen * * * Sague was a salesman and he was to sell stock and we were to split the commission. * * *"

It could be inferred from certain expressions of Thraves standing alone, that he had sold to Sague outright the 100,000 shares of stock, · but this inference is forbidden by Thraves' further testimony as follows: "I don't say that I sold stock to Sague, but I say this, Sague was ready to pay for it and went down to the bank to pay for thirty odd thousand shares of stock * * * Sague was a salesman to sell stock and to divide with me the amount between $3.25 and $5.00 (per share)."

If therefore it cannot be deduced from the writings that Sague was the agent of Thraves to sell the stock, the evidence referred to above, and other evidence of like tenor in the record, was sufficient, in our opinion, to raise the issue of agency as a mixed question of law and fact.

■ Having determined that Sague was Thraves' agent, we believe the evidence as to his statements and conduct in regard to the sale of the 100,000 shares of stock was sufficient to raise the issue as to the breach of the contract by plaintiff.

As heretofore shown, Thraves engaged Sague to sell 100,000 shares of the oil stock; the writings obligated Sague within 60 days to sell $100,000 worth of stock, and thereafter to sell and turn in $50,000 worth per month until the 100,000 shares were sold. This obligation, in turn, became and was the obligation of Thraves to Hooser. Hooser agreed to escrow this amount of the stock, in a trust company in New York City, available to Sague for delivery when and as sales were made. In partial compliance with the agreement in this respect, Beason, acting for defendant on February 13, 1925, sent by express to the Seaboard National Bank, New York City, escrow agent, 19,750 shares of the stock; the certificates were made out in the name of J. K. Sague, signed by Hooser president, and Beason secretary of the corporation. In connection with the shipment of the stock, Beason wrote the bank as follows: "You 'will please hold the above stock certificates in escrow and deliver same to Mr. J. K. Sague, or his properly authorized agent, upon the payment to you of 65 per cent of the par value of such certificates, that is, the sum of Three Dollars and Twenty-five ($3.25) per share. You may deliver to him certificates for any number of shares desired by him, upon payment by him to you of the above price per share for such certificate or certificates." The letter also instructed the bank to place revenue stamps on the stubs of the certificates when deliveries were made, deduct the price of the stamps from the amount paid in by Sague, and place the balance to the credit of defendant Hooser.

On February 20, 1925, the bank returned this stock by express to the oil company at Dallas, and wrote Beason that it was not satisfactory to deliver the certificates to Sague in their then form, and credit cash payments therefor to Hooser, and also stated that it was not satisfactory to Sague to take the certificates in their form and under the conditions. (We think the objection urged to the stock hypercritical. Under the circumstances, the transfer or indorsement of the certificates by Sague would have passed good title to the stock as against both the corporation and Hooser.)

No other stock was afterwards sent by defendant, or on his behalf, to the escrow agent for delivery to either Thraves or Sague.

Beason's testimony is to the effect that there was no refusal to issue stock to any purchaser designated by either Thraves or Sague; that neither made any such request. He denied that any stock, other than the 100,000 shares allotted to Thraves for Sague, was to be placed in escrow in New York City; that the stock returned by the bank was not sent back because they made requirements not authorized by the contract, and principally because he received a wire from Sague "saying that he would not go on with the deal." Hooser testified: "I figured that at the end of 60 days he was to sell so much stock; when that was not sold I figured he was through, I mean 60 days from January 26."

The obligation of Sague to Thraves to sell 100,000 shares of the stock on the terms and within the time stipulated became, as before stated, Thraves' obligation to Hooser, and was a material part of the undertaking, as it meant $325,000 cash to Hooser. If, instead of allotting to Sague that amount of stock, Thraves had retained the same for sale under the conditions and stipulations named in the Sague proposal, and thereafter had failed, as the evidence tends to show Sague did, to report sales or request the issuance of stock to purchasers, and had declined to go on with the contract, the issue as to the breach of the contract by him would, in our opinion, have been presented.

■ Furthermore, we are of opinion that the evidence raised an issue as to the amount of damages sustained by plaintiff. Hooser gave testimony to the effect that there was a 40 per cent. decrease in production of oil from these leases within 60 days, that is, during February and March, 1925, caused by water coming into the oil wells. Plaintiff also testified that he knew that for 60 days prior to the sale of the properties by Hooser Oil Company there was some decrease in production of oil in that field. He also testified that, if

the 307,692 shares of stock had been sold (the amount necessary to raise $1,000,000.00 cash to be paid Hooser), and if 120,000 shares had been left in the treasury of the company, as per agreement of the parties, "we would then have had an authorized capital stock of $3,000,000.00 with properties worth $2,000,000.00, and with a capital stock outstanding of $2,400,000.00, and we would have had in the treasury 120,000 shares of the par value of $600,000.00, or something like that."

It is not disputed that the stock issue was based exclusively upon the value of these oil leases; hence any fluctuation in production would naturally cause fluctuation in the market value of the stock. Thraves testified that the agreement contemplated that all stock, including that to be sold by Sague, was to be placed in escrow in New York City, ready for delivery as sales were consummated, and further said that the stock could have been sold according to contract if defendant had placed the stock in escrow and made it available for deliveries. Beason denied that the agreement contemplated that any stock was to be placed in escrow, except the stock allotted to Sague; and, furthermore, that neither Sague nor Thraves reported sales with request for the issuance of stock to or in the name of any purchaser.

This evidence, in our opinion, tended to prove, and the jury could have so found, that the stock was not in fact worth par, and that, by reason of decreased production immediately following the organization of the company, it suffered a decline in actual value. We think this question should have been submitted to the jury for their determination.

■ Defendant complains further of the action of the court in excluding from the jury certain telegraphic correspondence that passed between Sague and Beason, relative to the matters involved as follows: (1) Beason to Sague, telegram dated February 12, 1925, reading: "Curb requires fifteen per cent of stock sold to bona fide purchasers before listing, can you sell this amount four hundred fifty thousand dollars par before stock listed on curb, question stop Am sending stock book to Seaboard National Bank New York to be held in escrow Stock issued direct to you and will be delivered in quantities desired upon payment by you of net price"; (2) Sague to Beason, telegram dated February 13, 1925, reading: "You should have issued stock to Hooser's friends then had them endorse certificates and return to Hooser, this is usual method pursued in all cases, we have sold so far some thirty thousand shares subject of course to listing cannot make deliveries prior to trading, am writing you fully"; (3) Beason to Sague, telegram dated February 13, 1925, reading: "Answering your wire, stock will be issued only to bona fide purchasers"; (4) Sague to Beason, telegram dated February 13, 1925, reading:

"Our definite proposition is as follows: stop. All stock of company must be deposited with trust company then fifteen per cent of stock should be issued to different individuals endorsed by them and redeposited with same trust company during life of our contract stop Also five thousand shares of stock must be issued immediately and delivered to broker for preliminary expenses and market operations quoting expenses of listing stock on New York curb Stop If these conditions are met we are ready to proceed with campaign to sell stock Stop Otherwise we will not be able to handle proposition Stop Answer immediately as cannot keep broker committed unless can assure him of prompt action Stop Believe all these details can be worked out satisfactorily if you will come to New York immediately with full authority to act in conjunction with us"; (5) Beason to Sague, telegram dated February 13, 1925, reading: "Your demand for bogus transfer of stock will not be complied with"; (6) Sague to Beason, telegram dated February 16, 1925, reading: "Sorry you feel proposed issue is bogus simply following accepted practice of all companies listed here, can sell one million dollars of stock to one party providing they can have oil runs at posted prices, could this be done."

The objection urged and sustained to the introduction of these telegrams was that Sague was not a party to the contract, and that the communications between him and Beason were not binding on plaintiff. Plaintiff made a further objection to telegram No. 4, quoted above, to the effect that no sufficient predicate was shown for its introduction. The latter objection was waived; the bill of exception recites that, prior to the trial, attorneys for the parties agreed that proof as to the delivery of telegrams, offered in evidence from the telegraph office, should be waived.

Sague's relation to the contract between plaintiff and defendant was alleged by both parties, his agency for Thraves was alleged by defendant and denied under oath by plaintiff. The theory of the case adopted by us is that Sague was Thraves' agent to market 100,000 shares of the stock; hence statements and acts made and performed within the scope of the employment were binding upon Thraves. The excluded evidence tended to show that plaintiff (acting by and through Sague) made demands and insisted upon compliance with conditions not found in the written contract, and that the contract was breached in other respects. We hold, therefore, that the court erred in excluding the evidence.

For reasons hereinbefore set out, we think the judgment of the court below should be reversed and the cause remanded for another trial, and it is so ordered.

Reversed and remanded.