## THRAVES v. HOOSER.
### No. 1496—5776.

Commission of Appeals of Texas, Section A.
Jan. 6, 1932.

Bailey, Nickels & Bailey and Luther Nickels, all of Dallas, for plaintiff in error.

Cockrell, McBride, O'Donnell & Hamilton and Webster Atwell, all of Dallas, for defendant in error.

SHARP, J.

W. V. Thraves brought this suit against John W. Hooser, and in substance alleged that the suit was based upon a contract made in the form of a letter dated January 6, 1925, and thereafter amended. This contract is made part of the petition and marked Exhibit A; that Hooser was the owner of certain oil leases in Navarro county and other parts of Texas; that by the letter he agreed with Thraves that a Delaware corporation should be chartered with a capital stock of $5,000,-000 par value, divided into shares of $100 each, and these shares divided into two sections of 100,000 shares of class B voting stock and 490,000 shares class A stock. This letter provided that when the corporation should be properly chartered Hooser should transfer his interest in certain oil leases and three-fourths of his interest in certain other oil leases, for which he was to receive all of the capital stock of the corporation, except qualifying shares of directors; that when he had done this, Thraves should sell a sufficient amount of the stock at not less than 65 per cent. of its par value to pay Hooser a million dollars. Hooser reserved the right to transfer all of his interest in the properties to the corporation to which he had agreed to transfer three-fourths of his interest. The proceeds of the sale of all stock were to be delivered to him until he received one million dollars, and, when he had received that million dollars, he was to transfer one-half of all the unsold stock to Thraves. This contract was amended as shown by Exhibit B to plaintiff's petition, which provided that all advertising and all articles for publication pertaining to the company or its officers should first be submitted to Hooser or his general counsel before released for publication.

On January 26, 1925, the agreement was further amended by an agreement entered into between Hooser and Thraves wherein it was recited that it was found expedient to amend the two agreements of January 6th and 7th, respectively, hereinabove mentioned. This agreement was for the purpose of embracing the contract between J. K. Sague and Thraves in the contract between Hooser and Thraves, and the agreement between Sague and Thraves was made a part of it and marked Exhibit A to the contract dated January 26, 1925. In the amended contract dated January 26, 1925, it was agreed that the contract entered into by Thraves with Sague for the sale of the stock was in compliance with the terms and provisions of the contract expressed in the letters or contract of January 6th and 7th. It was further agreed that in consideration of Hooser having given his consent to changes in the charter, stock, etc., Hooser, at any time he should desire, could withdraw any or all of the stock Thraves was empowered to sell under the original contracts and amendments, and that, should he do so, he should credit the stock on the amount he was to receive under the original contract at 65 per cent. of the par value until the consideration had been paid in full. It was recited that this agreement was necessary for the proper interpretation of the agreement made with Sague.

In the latter agreement, it was provided that Hooser could withdraw his stock from sale at the wholesale price thereof; that is, at the price Sague and his associates would have to pay Hooser in the event the stock should be sold at the market price fixed by Hooser. It was also agreed that, if at any time he desired to do so, Hooser could retain the stock in lieu of any part or all of the money consideration named in the contract at a price of 65 per cent. of its par value, regardless of the market value of the stock. It also provided that Hooser should have all the rights and privileges of naming the price at which the stock should be sold, withdrawing it from the market, etc., set out in the contract between Thraves and Hooser.

It was provided in this contract that, in the event Thraves had not completed the marketing of the stock by January 1, 1926, the contract with all of its amendments should terminate at the option of Hooser. The contract further provided that the capital stock of the proposed company should be 600,000 shares of the par value of $5 each; that the present provision for voting the stock should be abrogated and all stock to be of one class; that the Hooser Oil Company should place in escrow in a trust company of its own selection 100,000 shares of the stock to be marketed by Sague and associates at a minimum price of $3.25 per share. It was provided that the price of the first 20,000 shares to be sold by Sague should be fixed absolutely at $3.25 per share. It was further provided that as to any other unsold balance above this 20,000 shares Hooser should, at any time his discretion might dictate, increase the price at which it was to be sold; Hooser to receive from the price so fixed by him 65 per cent., and the balance of 35 per cent., to go to what was called the Marketing Syndicate.

It was further provided that Sague should within thirty days prepare a campaign for the marketing of the stock, and at the conclusion of sixty days from the date of the signing of the contract turn into the treasury $100,000, the proceeds of 20,000 shares, and thereafter a minimum of $50,000 per month until 100,000 shares should be disposed of, and, in case of failure to do so, the agreement should be canceled.

These instruments sued upon were attached to the petition and made a part of it. The market value of the shares of stock was alleged to be $5 each, and Thraves sued to recover the market value of the shares aggregating $894,230.

Hooser answered by various exceptions and special pleas, and denied that he repudiated the contract as alleged; that he was able and willing to perform his part at all times, and alleged specifically the contract with J. K. Sague made a part of plaintiff's petition, and alleged that Sague violated this contract by refusing to carry out the same, and that Sague demanded that Hooser issue false and fraudulent shares of stock to various persons. Such persons have indorsed their certificates to the New York Trust Company and deposited there, and that 5,000 shares of stock be issued and delivered to Sague in order that he might falsely and fraudulently transfer it on the stock exchange and make it appear that the stock was active and desirable; and that he had further demanded of Hooser that all of the stock be deposited in the New York Trust Company, all of which demands were unwarranted by the contracts between the parties, and that Hooser notified Thraves and Sague that he would not issue such fraudulent stock, whereupon they notified Hooser that, unless such changes in the contract were made and such conditions complied with, no further effort would be made to sell the stock, and that this constituted a breach of the contract so as to excuse Hooser from further performance.

In a supplemental petition, Thraves denied under oath that J. K. Sague or J. K. Sague and associates was or were the agent or agents of Thraves in any sense, and especially denied the alleged agency. It was further alleged by Thraves that if J. K. Sague or J. K. Sague and associates did any of the things alleged by Hooser, and if such conduct constituted a breach of the contract, nevertheless Hooser waived such breach, treated the contract as continuing, acted thereunder, and thereby caused Thraves to rely upon the fact that the breach was waived, and was estopped to claim or enforce the same; that the sale of the properties by the Oil Company, and the acts of Hooser in causing same, rendered it impossible for either Thraves or Hooser to perform the contract, and constituted a breach by defendant.

At the conclusion of the evidence, Hooser requested the trial court to instruct the jury to return a verdict in his favor, which the court denied. On the contrary, the court directed a verdict for Thraves against Hooser for the sum of $269,229 damages in respect to the 307,691 shares of stock, the sale of that amount of shares was necessary to pay Hooser the sum of one million dollars in cash, and the further sum of $355,770 in respect to the stock Thraves would have been entitled to receive on completion of the contract, making a total of $624,499. The trial court entered judgment accordingly in favor of Thraves against Hooser, from which judgment Hooser prosecuted an appeal to the Court of Civil Appeals. That court reversed and remanded the case for a new trial. 25 S.W.(2d) 678. We refer to the opinion of the Court of Civil Appeals for a more detailed statement of the pleadings and facts contained therein. The Supreme Court granted a writ of error to review the opinion of the Court of Civil Appeals.

Counsel for Thraves contend that the Court of Civil Appeals erred in considering the assignments of error and propositions urged by Hooser in that court, because they are too general and do not comply with the rules and law governing same.

The case was tried before a jury, and the record shows that at the conclusion of the evidence Hooser requested the court to instruct the jury to return a verdict in his favor. The court refused to do so. However, the court did instruct the jury to return a verdict in favor of Thraves against Hooser for $624,999, as shown above. To this action of the court, Hooser presented many exceptions and filed many assignments of error. The substance of some of them is herein set out as follows:

(1) The court erred in instructing a verdict for the plaintiff, because same is not supported by any evidence, and is contrary to all of the evidence in the case.

(2) In refusing to give the peremptory instruction to the defendant's timely request.

(3) Because there is no evidence of a breach by the defendant of the contract sued upon by the plaintiff.

(4) The court erred in instructing the jury to find for the plaintiff for the sum of $269,-229 damages suffered in respect to 307,691 shares of stock, which the court instructed the jury was shares of stock necessary to be sold in order to pay the defendant from the proceeds of the sale the sum of one million dollars; there being no evidence of any sale having been made at any particular price, and the only evidence of the cost of sale being the testimony of the plaintiff alone that the cost would have been more than 75 cents per share.

(5) The court erred in instructing the jury to find for the plaintiff for the sum of $355,-

770 damages suffered in respect to shares of stock which the plaintiff would have been entitled to receive upon completion of the sales mentioned in the peremptory instruction; there being no evidence of the cost of sales except the evidence of the plaintiff alone that it would have cost 75 cents per share to sell the stock.

(6) The court erred in instructing the jury to find for the plaintiff and against the defendant in the aggregate sum of $624,999 because there is no evidence of what it would have cost to sell the stock, except the evidence of the plaintiff himself who expressed the opinion that it would have cost 75 cents per share to sell the stock, and the demand being an unliquidated one, and conditioned upon the sale of stock of the defendant, the measure of damages was always a question for the jury.

In the ninth to the twentieth assignments of error, inclusive, error is complained of the action of the trial court in overruling the exceptions urged by Hooser in refusing to sustain his various exceptions leveled at the peremptory instruction given by the court to the jury. To set out the details of the various exceptions would prolong this opinion to an unnecessary length. The foregoing statement will suffice for the purposes of this opinion.

Article 1844, R. S. pertaining to assignments of error, in part, reads as follows: "An assignment shall be sufficient which directs the attention of the Court to the error complained of." The courts of this state, and especially the Supreme Court, have always been liberal in the construction of the rules and statutes governing assignments of error and propositions submitted to the appellate courts in cases appealed. The Supreme Court has repeatedly held that when an assignment of error is sufficiently specific to enable the court to see that a particular ruling is complained of, it should be held good, although it should fail to state the reason why such ruling is claimed to be erroneous; that it was never intended that technical and arbitrary requirements should control the appellate courts in considering cases brought up on appeal. Clarendon Land Investment Co. v. McClelland, 86 Tex. 179, 23 S. W. 576, 1100, 22 L. R. A. 105; Cotton Press Co. v. McKellar, 86 Tex. 700; Wilson v. Johnson, 94 Tex. 276, 60 S. W. 242; Cammack v. Rogers, 96 Tex. 457, 73 S. W. 795, 796.

■ Whether or not the assignments of error urged by Hooser in the trial court are in line with the requirements of the rules and law of this state under this record, is immaterial. The Court of Civil Appeals, in the exercise of its sound discretion, saw fit to pass upon them, and held that they were sufficient to meet the requirements of the law. As to whether or not the Court of Civil Appeals, in its sound discretion, may consider and pass upon an assignment of error not in strict compliance with the statute and rules of the court upon a point defectively raised, was definitely settled in the case of Cammack v. Rogers, supra. That case, in our judgment, involved the question raised here. The Court of Civil Appeals in that case certified to the Supreme Court two questions, and called attention to the two lines of decisions upon the questions certified. The questions certified are as follows:

"(1) Where an assignment of error complains of two rulings of the trial court, each of which relates to separate and distinct questions, which is followed by appropriate propositions and statements explaining each of the two questions raised and rulings complained of, is the assignment so general that it should not be considered, or may it, under such circumstances, be aided and explained by the propositions and statements; and, if such is the case, should it, by the Court of Civil Appeals, be deemed sufficient so as to entitle the court to pass upon either of the questions raised by the assignment, propositions, and statements?

"(2) Is the assignment of error, in connection with the propositions and statements, as above set out, sufficient to authorize its consideration by this court?"

Judge Williams, speaking for the Supreme Court of this State, answered the foregoing certified questions in the following plain and pointed language:

"1. The decisions first cited in the certificate condemn the assignment of error as insufficient, because it complains of two distinct rulings of the court below. The decisions also hold that propositions in briefs do not supply the place of a valid assignment. The decisions of this court last cited in the certificate do not conflict with the others, the objections to the assignments considered being of a different character. Further discussion of the subject of assignments of error than is found in Land Co. v. McClelland Bros., 86 Tex. 191; 23 S. W. 576, 1100, 22 L. R. A. 105, would not, in our opinion, be useful.

"2. The fact that an assignment of error is not in strict compliance with the statute and the rules of court does not deprive the Court of Civil Appeals of authority to decide a point thus defectively raised. While a party who has not complied with the rules of practice in presenting errors complained of may not be entitled to demand, as a right, that they be noticed, the court, in the exercise of sound discretion, has the authority to pass upon them. Whether or not, in such cases, the point sought to be made should be considered, is a question for the Court of Civil Appeals to determine under all the circumstances."

Judge Williams, in rendering the opinion, referred to the case of Land Company v. Mc-Clelland Bros., mentioned by the Court of Civil Appeals in the statement with the certified questions, and referred to the discussion in that case on the subject of assignments of error. Judge Gaines, in rendering the opinion for the Supreme Court in that case, used the following terse language:

"It is to be borne in mind that the statute and rules which require errors to be assigned were intended primarily for the relief of the appellate courts, and to secure a prompt dispatch of the business that should be brought before them. They should be given a reasonable and practical construction, and not one calculated to embarrass suitors in the appellate tribunals by unnecessary restrictions. It is certain that it was never intended to hedge either the courts of civil appeals or the supreme court around with technical and arbitrary requirements, so as to cut off the approach of such parties as seek relief in good faith from the consequences of supposed errors committed to their prejudice in the trial courts.

"Where an assignment of error is sufficiently specific to enable the court to see that a particular ruling is complained of, it should be held good, although it should fail to state the reason why such ruling is claimed to be erroneous. An assignment may be brief, and yet specific; and brevity, in such cases, is commendable, and accords with good practice. The reasons by which allegations of error are sought to be sustained find their proper place in the propositions, statements, and authorities required to be set forth in the brief under and in support of the respective assignments."

In our opinion, the assignments of error above quoted are sufficient to call the attention of the Court of Civil Appeals to the fact that Hooser is complaining of the action of the trial court in directing a verdict for Thraves against him, for the reason that the evidence raises fact issues, which should have been determined by the jury, and therefore the Court of Civil Appeals was authorized to consider the assignments of error presented, and pass on the question as to whether the trial court erred in directing the verdict in favor of Thraves. We here call attention to the fact that we are not passing on a case where there is entire absence of an assignment, but on a case where, at most, the assignments are merely defectively drawn.

This brings us to the consideration of another question: Did the trial court err in instructing the jury to return a verdict for plaintiff, as was done? This record discloses that there was no testimony introduced on behalf of Thraves except his own. The contract embraced in Exhibit B provided that all advertising or other articles for pub-

lication pertaining to the company or its officers shall be submitted to and approved by the general counsel for the company before released for publication. Thraves testified that his Exhibit N, which is a statement for publication, was made by Hooser in accordance with the provision of the contract, and was given to Thraves for publication. Hooser emphatically denied this statement. A. L. Beason, the general counsel and secretary for the Hooser Oil Company, contradicted Thraves upon this question. Hooser further contradicted the testimony of Thraves with reference to what Thraves did after receiving the wire from Beason that the producing properties had been sold. Thraves further testified that he tried to get the stock for sale. Beason testified that as secretary of the Hooser Oil Company he never at any time refused to issue any stock to any purchaser, nor did he refuse to issue any stock to any one designated by Thraves; that Thraves never at any time made any request of him to issue stock to any purchaser, neither did Sague make any such request; that Thraves never told him at any time to issue any stock in the name of Bolton; that if he had asked him, and had tendered the money upon the payment of $3.25 a share, he would have issued any number of shares up to the required number to have made one million dollars to Thraves or any duly appointed agent; Sague or any body else. Hooser testified, in substance, that Sague was to sell $50,000 worth of stock every month; he was to sell the first $100,000 in sixty days, and that he had not sold any at the end of sixty days; that was under the Sague-Thraves contract; that if Thraves had notified him to issue stock to any purchaser, and had tendered the money and asked him to send the draft attached, he would have sent all the stock he had if he had paid for it. He would have been pleased to have made a million dollars out of the property at that time. We quote some extracts from the testimony of Thraves as follows:

"I started taking steps to sell this stock immediately after the company was organized and Mr. Hooser returned here. We started at once to arrange for the sale of the stock. I would not say that I first began to arrange for the sale of the stock after Mr. Hooser had been in New York. I had talked to Mr. Bolton and others about the sale of the stock, and I had talked to Mr. Sague, one of the salesmen. Mr. Bolton was going to buy stock, he was a purchaser but I didn't have his contract. He agreed to buy that property. He and I were going to buy the property under the original agreement. There is a difference between an agreement and a contract. I had an agreement with him. As I recall it, he was to get the stock at about $4.20. The par value was $5.00, but he was to get his stock at what Sague got his. Sague was a

salesman and he was to sell stock and we were to split the commission, but that is not the arrangement I had with Bolton, there was no commission to come out of that and as I remember it, I sold it straight to him for $4.20 a share. I am basing that sale to him as a part of my damages. I would not try to get money from Hooser unless I was definite. I don't want anything in this lawsuit but what I am entitled to. Bolton agreed to buy $200,000 worth of the stock. I may have my figures wrong, but I was making eighty some cents a share out of the stock that Sague was to sell for me, and he was to buy $200,000 worth of stock—that is, Bolton. I don't recall the exact price per share but he was to get it at the same price that Sague got it, plus the amount I was to get; I was to get 50 per cent. of Sague's profits, between $3.25 and $5.00, which would be 80 some cents. I was trying to even up the deal with him when we were trying to sell the property originally; I was going to let him have this stock when I could not deliver the property to him. I agreed to let him have $200,000 worth of stock. Bolton was a bona fide purchaser. I sold the stock to him about the time that Mr. Sague was ready to take his, which was within a few days after Mr. Hooser and Judge Beason left there. I would say around the 21st that Bolton agreed to buy $200,000 worth of stock at about $4.15 a share. I never made any demand on Hooser to transfer that amount of stock to Bolton, but I did demand that Hooser transfer it to his agent. I made a demand on Hooser and the Secretary of the company to deliver the stock to their representative in New York, the Seaboard Bank and Trust Company, so that we could get it for Bolton and Mr. Sague.

" * * * We were not going to sell but just enough to pay Hooser his money and then sell the other as property values justified, we were not going beyond that."

Again: "We were going to sell enough stock at $3.25 to pay him $1,000,000. When he got his money back we split 50–50. I think we cut the issue of stock to $3,000,000 before we got through with it. The contract was for $5,000,000 but we changed that contract before we got through with it; we trimmed that down within the value of this property. This property paid handsome dividends to the company. We were to organize a $5,000,000 corporation with assets that would amount to only $2,000,000; that is substantially correct, but we were not to sell that stock you understand until the company justified it. It was all to be issued and Hooser and I were to get it but we were not to sell it. I would not offer it myself and I don't think Hooser would. There was nothing to keep us from selling it if we wanted to impose upon some man, but he would be a fool to buy it. That would not be our profit until it was worth it. I wanted the

stock so as the company developed the stock would be valuable and we could get what the stock was worth. That was the plan and Hooser promised to make the company do that. He was going to continue working as president and was going to double the size within a year. I didn't put any money into the contract, but if I had contracted to put it in I would have. I deny that we got a corporation with $2,000,000 assets and $5,-000,000 liabilities in the nature of stock. Stock is not a liability of a corporation until you use it in some way. The only liability that company had was what was due Hooser until he ran it in debt himself. It is not a fact that there was not to be treasury stock. I would not fool with a company that way."

Mr. Webster Atwell, one of the attorneys for Hooser, also testified, and his testimony contradicts in some respects the testimony of Thraves.

At the risk of being tedious, we have set out the foregoing testimony for the purpose of showing the character of testimony upon which an instructed verdict was given. It shows upon its face that it contained certain indefinite features. Much other testimony could be quoted, but this is sufficient.

On the issue as to whether Thraves could have sold the stock, the opinion of Thraves that he could have sold the stock, if competent under all the facts, a question not presented to us by any assignment, was not such evidence that would establish the fact as a matter of law. Clearly it was not the province of the witness to act as judge or jury. Certainly he was not called upon, nor was it permissible for him, to determine controverted questions of fact, or to pass upon the preponderance of testimony. One of the ultimate issues that the jury had to decide was whether Thraves could and would have sold the stock but for the alleged breach of the contract by Hooser. This was necessary to be determined in Thraves' favor before the amount of damages would even become material. It was competent for Thraves to give the jury all the facts and circumstances on which he based his claim that he could have sold the stock, but the final issue as to whether the stock could have been sold was an ultimate issue for the jury and not for the witness to decide. He is not permitted to usurp the province of the court and jury by drawing those conclusions of law or fact upon which the decision of the case depends, which would justify the trial court in directing a verdict in his favor, as was done in this case.

The rule is now well settled in this state by the decisions of the Supreme Court that when a jury has been selected for the purpose of trying out the facts of a case, it matters not how positive and uncontradicted the testimony of an interested party may be; the question of his credibility must be sub-

mitted to the jury. Mills v. Mills (Tex. Com. App.) 228 S. W. 919; Pope v. Beauchamp, 110 Tex. 271, 219 S. W. 447; Railway Company v. Runnels, 92 Tex. 305, 47 S. W. 971; Sigmond v. Moore (Tex. Com. App.) 37 S.W.(2d) 121; Clem v. Fulgham (Tex. Com. App.) 14 S.W. (2d) 812; Turner v. Grobe, 24 Tex. Civ. App. 554, 59 S. W. 583, 585; Cheatham v. Riddle, 12 Tex. 112; Stitzle v. Evans, 74 Tex. 596, 12 S. W. 326; Rwy. Co. v. Johnson, 23 Tex. Civ. App. 160, 55 S. W. 772, 791; Houston National Bank v. Adams (Tex. Civ. App.) 295 S. W. 198, 200; Jarecki v. Hinds (Tex. Civ. App.) 295 S. W. 274; Coats v. Elliott, 23 Tex. 613; Sonnentheil v. Brewing Co., 172 U. S. 401, 19 S. Ct. 233, 43 L. Ed. 495; Daugherty v. Wiles (Tex. Com. App.) 207 S. W. 900; Speer's Law of Special Issues in Texas, § 167, and decisions collated thereunder. In some cases, it has been held that if the evidence establishes a fact to that degree of conclusiveness which precludes a reasonable doubt to the contrary, that there must be no room for fair and reasonable minds to reach different conclusions from the evidence, a peremptory instruction would be justified. Grand Fraternity v. Melton, 102 Tex. 399, 117 S. W. 788; Felts v. Bell County, 103 Tex. 616, 132 S. W. 123. However, the evidence in this case clearly distinguishes it from the evidence involved in the cases just cited and similar cases; and considering Thraves' connection with this litigation and the transaction leading up to it, and all the circumstances of the case, the rule announced in the cases just cited would not control. It logically follows that the trial court erred in directing a verdict for Thraves.

The trial court excluded the introduction in evidence of certain telegrams described in the opinion of the Court of Civil Appeals. These excluded telegrams are embraced in certain bills of exceptions, and each one of the bills of exception complaining of the trial court excluding them from evidence recite, in substance, that after Thraves had testified that he had made arrangements with Sague to sell 100,000 shares of stock in the Hooser Oil Company, and that he had an arrangement with Sague that the latter should go down to the agent of Hooser and pay for this stock and take it out and sell it for not less than $5 per share and divide the dividends; that he had a written contract with Sague in the form of Sague's written proposal to him for the sale of the stock, and after the witness Beason had testified that when he went to Thraves' room at the hotel he, Thraves, told him that he had an agent who was going to take charge of the sales in New York who wanted some changes made in the charter; that he and Hooser and others were invited to meet this party some time next week, and that he, Beason, went and met Sague; that Robert Thraves and W. V. Thraves were present; that the matter of amending the charter was discussed, and there was nothing said except that Sague was

an agent who was to handle the stock sales in New York City, and the charter must be amended to meet his ideas; that this was the first time Beason ever met Sague, and it was at the request of W. V. Thraves; that the proposal signed by Sague and attached to Thraves' pleading was handed to Beason and Hooser in Sague's office by W. V. Thraves and his brother, Robert Thraves, and they were given to understand that those proposals were acceptable and should be signed and included in a copy of the agreement with Sague, and after Beason had testified that Sague prepared the proposal which was carried to W. V. Thraves by his brother Robert, and, after they had further conference with Sague, the copies were attached to the contract, and Hooser then offered in evidence the telegrams to J. K. Sague, above described. Thraves objected to the introduction of each of the telegrams on the ground that Sague was not a party to the contract, and the communications between him and Beason or Hooser were not admissible to bind Thraves.

It is earnestly insisted by counsel for Thraves that the telegrams offered in evidence by Hooser were properly excluded. It is further contended that if it be true that the evidence raised an issue as to the amount of damages sustained by Thraves which ought to have been submitted to the jury, it is yet true that such issues would relate solely to the item or part of the damages allowed for the stock which would have remained and been divided between Hooser and Thraves and would not have had any relation to the item of $269,229 damages allowed for lost profits in respect of the 307,693 shares which were to be sold through Thraves; that he ought to have been given and should now be given opportunity to make remittitur in respect of the item of $355,770; that by giving opportunity to make remittitur for that amount, the exclusion of the telegrams, if error, became harmless.

Counsel for Hooser contend that, in view of the pleadings, the various contracts above described by and between the parties and the testimony introduced showed that the telegrams passing between Sague and Beason went to the very foundation of the contract entered into between Hooser and Thraves, and that the act of Sague was the act of Thraves, and that Thraves was bound by the acts and conduct of Sague, his agent.

In passing upon the various contracts involved in this case, Judge Looney, in rendering the opinion of the court, said [25 S.W.(2d) 678, 682]:

"These writings, in our opinion, are not susceptible of any reasonable construction, other than that Sague became and was the agent of Thraves to sell 100,000 shares of the stock, and was under obligation to market the same, on the terms and within the time mentioned in said proposal. While his em-

ployment was by Thraves and the obligations of his proposal ran to Thraves, yet they were incorporated into and became a part of the supplementary contract between Thraves and Hooser. It follows, therefore, that Sague's failure to comply with the stipulations, that is, to sell stock and turn in cash in the amounts and within the periods mentioned, and his refusal to proceed further in the execution of the contract, as the evidence tended to establish, would bind Thraves just as if he had been acting in person.

"But, if it cannot be correctly said that Sague's agency is apparent from the terms of the writings, yet the evidence was sufficient, in our opinion, to present the issue of agency as a mixed question of law and fact."

Again he said: "Sague's relation to the contract between plaintiff and defendant was alleged by both parties, his agency for Thraves was alleged by defendant and denied under oath by plaintiff. The theory of the case adopted by us is that Sague was Thraves' agent to market 100,000 shares of the stock; hence statements and acts made and performed within the scope of the employment were binding upon Thraves. The excluded evidence tended to show that plaintiff (acting by and through Sague) made demands and insisted upon compliance with conditions not found in the written contract, and that the contract was breached in other respects. We hold, therefore, that the court erred in excluding the evidence."

In Bouvier's Law Dictionary, volume 3, at page 2687, it is said: "The agent is one who undertakes to transact some business, or to manage some affair, for another, by the authority and on account of the latter, and to render an account of it; 1 Livermore, Ag. 67. See Co. Litt. 207; 1 B. & P. 316." See, 21 R. C. L. p. 817; 2 Tex. Jur. § 5, pp. 384 and 385.

The rule is old and well settled that all such statements, declarations, or acts as are within the scope of the agent's employment, or impliedly possessed by him by virtue of his representative character, are binding upon the principal. 21 R. C. L. § 25, pp. 844, 845; 2 Tex. Jur. § 143, p. 545.

The rule is well established in this state that it is within the province of the court to determine whether under an ascertained state of facts an agency exists, but it is for the jury to determine the existence of facts sufficient to constitute agency. Bradstreet v. Gill, 72 Tex. 115, 9 S. W. 753, 2 L. R. A. 405, 13 Am. St. Rep. 768; Daugherty v. Wiles (Tex. Com. App.) 207 S. W. 900 (adopted as the opinion of the Supreme Court).

The Court of Civil Appeals correctly held that the telegrams excluded were admissible in evidence.

Therefore we recommend that the judgment of the Court of Civil Appeals reversing and remanding this case to the district court for another trial be affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals reversing that of the district court is affirmed, as recommended by the Commission of Appeals.